IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

UNITED STATES OF AMERICA,

Plaintiff,

vs.

DARRIN MALLATT,

Defendant.

**4:13CR3005**

**SENTENCING MEMORANDUM**

This matter is before the court for sentencing.  This memorandum opinion supplements findings made on the record at a sentencing hearing on November 8, 2013.

## I.  BACKGROUND

### A.  Facts

The defendant was charged in a two-count indictment with receipt and distribution of child pornography in violation of 18 U.S.C. § 2252A(a)(2) (Count I) and possession of child pornography in violation of 18 U.S.C. § 2252(a)(4)(B) (Count II).[1] Filing No. 1, Indictment.  He entered a plea of guilty to Count II of the Indictment (the possession charge).  Filing No. 21, Plea Agreement.  In the plea agreement, the United States ("the government") agreed to dismiss Count I, the receipt and distribution charge.

---

[1]Specifically, he was charged in Count I of the indictment with knowingly receiving and distributing child pornography as defined in 18 U.S.C. § 2256(8) in violation of 18 U.S.C. § 2252A(a)(2), and in Count II with knowingly possessing "one or more matters which contained visual depictions which were mailed and had been shipped or transported using any means or facility of interstate or foreign commerce and in and affecting interstate and foreign commerce, by any means, including by computer, the production of which involved the use of a minor engaging in sexually explicit conduct," in violation of 18 U.S.C. § 2252(a)(4)(B).  Filing No. 1, Indictment.  The distinction between the two counts is that receipt and distribution of child pornography (the crime charged in Count I) has a mandatory minimum sentence of five years and a maximum of twenty years, whereas, possession of child pornography (the crime charged in Count II) has no mandatory minimum and carries a maximum sentence of ten years for a first offender.  *See* 18 U.S.C. § 2252(b)(1); 18 U.S.C. § 2252A(b)(1).

*Id.*  The court accepted Mallatt's plea of guilty but deferred acceptance of the plea agreement pending the preparation of a Presentence Investigation Report (hereinafter, "PSR") by the United States Office of Probation (hereinafter, "the Probation Office") that calculated Mallatt's sentence under the United States Sentencing Guidelines ("the Guidelines").  Filing No. 23, Findings and Recommendation; Filing No. 30, Order.  At a hearing on September 13, 2013, the court granted the defendant's oral motion to continue his sentencing in order to procure expert testimony.  *See* Filing No. 34, text minute entry.

In the PSR, the Probation Office largely based its outline of the offense conduct on the prosecutor's version of events.  Filing No. 38, PSR (Sealed) at 6-7.  Pursuant to an investigation, investigators with the Lincoln Police Department and Nebraska Attorney General's Office identified IP addresses sharing child pornography that were assigned to the residence of the defendant.  *Id.* at 6.  The State Attorney General's Office, Lincoln Police Department, and Lancaster County Sheriff's Office executed a search warrant at the defendant's residence and found numerous videos and images depicting sexually explicit conduct involving children.  *Id.*  An examination of the defendant's devices showed 389 movie files and over 4,340 image files depicting children under 18 engaged in sexual activity or lewd and lascivious conduct and erotic nudity.  *Id.*  The thumb drives contained another 195 video files that depicted child pornography, including images of prepubescent females, and images of adults participating in sexually explicit conduct, including oral sex, penile-vaginal sex, penetration with objects, etc., with children.  *Id.*

The Probation Office determined that the defendant's base offense level was 18 under U.S.S.G. § 2G2.2(a)(2) for receipt of child pornography.  *Id.* at 8.  It found the following upward adjustments were applicable:  a two-level increase under U.S.S.G. § 2G2.2(b)(2) (for material containing a prepubescent minor); a five-level increase under U.S.S.G. § 2G2.2(b)(3)(B) (for distribution for the receipt, or expectation of receipt, of a thing of value, but not for pecuniary gain); a four-level increase under U.S.S.G. § 2G2.2(b)(4) (for material that portrays sadistic or masochistic conduct or other depictions of violence); a two-level increase under U.S.S.G. § 2G2.2(b)(6) (for use of a computer); and a five-level increase under U.S.S.G. § 2G2.2(b)(7)(D) (for more than 600 images).  *Id.* at 8-9.  The application of these enhancements results in an adjusted offense level of 36.  *Id.*  After subtracting three levels for acceptance of responsibility under U.S.S.G. § 3E1.1, Mallatt's total offense level under the Guidelines is 33.  *Id.*

The Probation Office assessed no criminal history points because the defendant had only been convicted of crimes that do not qualify for criminal history points under U.S.S.G. § 4A1.2(c)(2) ( speeding, for which he was fined).  *Id.* at 8.  At offense level 33 and criminal history category I, Mallatt's term of imprisonment under the Guidelines is 120 months (ten years) and his supervised release range is five years to life.[2]  *Id.* at 12.

The government accepted and adopted the PSR.  Filing No. 32.  At the hearing on September 13, 2013, defendant stated, through counsel, that he had no objection to the report.  The court accepted the PSR at that hearing.  The Probation Office

---

[2] Ordinarily, the Guidelines range would be 135 to 168 months at that criminal history category and offense level, but, because the statutorily authorized maximum sentence of 10 years is less than the minimum of the applicable guideline range, the Guidelines term of imprisonment becomes 120 months under U.S.S.G § 5G1.1(a)

recommended a sentence of 36 months (three years).   Filing No. 39, Sentencing Recommendation (Sealed) at 2.

Mallatt is 31 years old.  Filing No. 30, PSR at 2.  His criminal history is limited to four prior speeding tickets.  *Id.* at 9.  He is an only child, had an unhappy and isolated childhood, has very few friends, and was bullied and picked on in school.  *Id.* at 10-11.

He has a Bachelor of Science degree with a major in biochemistry and minors in chemistry, biological sciences and mathematics.  *Id.* at 14.  He attended graduate school toward a degree in teaching, learning and teacher education.  *Id.*  He completed 58 credit hours toward that program, but never successfully completed his student teaching.  *Id.*  He also attended graduate courses toward a forensic science degree at Nebraska Wesleyan University, but has not completed that degree, either.  *Id.*  He completed 42 credit hours with a cumulative grade point average of 2.97, but did not complete his thesis.  *Id.*  From April 1998, at age 16, to the present, he has been employed at Stouffer's Café and Pie Shop in Lincoln, Nebraska.  *Id.* at 15.  He is employed full time as a short order cook, earning $13.50 per hour.  *Id.*

The defendant was referred by defense counsel to Nicholas Giles, Psy.D., to evaluate his mental health treatment needs and to determine his risk to sexually reoffend.  *See* Filing No. 42, Exhibit ("Ex.") List, Ex. 1, Risk Assessment.  Dr. Giles conducted a three-hour interview of the defendant, reviewed police records and the Pretrial Services Report and administered objective tests.  *Id.*, Ex. 1 at 1.  Dr. Giles reported that the defendant was straightforward and candid about the offense.  *Id.* at 5. The defendant told Dr. Giles that he "downloaded the content 'out of curiosity at least initially to see what was out there,'" and noted that "'[i]t became easy to find in mass

quantities with file sharing.'"  The defendant also stated he "'ended up with more than intended'" and he would "'pick everything' for download, and later go back through it to 'see if he already had it,' and 'if new, would save it for later.'"  *Id.*  Dr. Giles also reported that the defendant "acknowledged that some of the females he was looking at were questionable in age" and "he 'knew some were younger than 16,' and estimated 'most were older than 11 or 12.'"  *Id.*  Further, the defendant "denied he found pre-pubescent females attractive."  *Id.*  Dr. Giles also reported that the defendant denied ever soliciting or attempting to solicit sexual contact with children.  *Id.*  He noted that "this was reportedly confirmed by successfully passing a pretrial polygraph related to sexual contact with a minor."  *Id.*

Dr. Giles reported that the defendant produced a valid and interpretable profile in response to the Millon Clinical Multiaxial Inventory III (MCMI-III) to assess personality issues.  *Id.* at 6.  Axis I clinical syndromes "were noteworthy for anxiety."  Dr. Giles found:

> [the defendant's] personality profile was elevated to significance for narcissistic and schizoid features.  Those with similar personality features typically have little interest or ability in experiencing the subtle aspects of interpersonal relationships.  An indifference to the actions and feelings of others, and an inability to engage in the give-and-take of relationships may be readily observed.

*Id.*  With respect to objective risk assessment testing, Dr. Giles stated that the defendant placed in the moderate range of presumptive risk on the STABLE-2007, a risk assessment measure designed to assess dynamic variables that have been demonstrated to be related to sexual re-offense.  *Id.*

Dr. Giles diagnosed Mallatt as having "Asperger's Disorder, Paraphilia Not Otherwise Specified (Pedophilic and Hebephilic arousal), and Adjustment Disorder with Anxiety." *Id.* at 7. He provided the following conclusion and recommendations:

> Mr. Mallatt is a 31-year-old Caucasian male who has been charged with one count of possession of child pornography. Results of the evaluation indicate Mr. Mallatt presents with a rather pronounced yet previously undiagnosed Asperger's Disorder. His history indicates a gross and sustained impairment in social interactions. Marked impairment in a failure to develop peer relationships, a lack of social and emotional reciprocity, difficulty in being able to seek or share enjoyment, interests, or achievements with others, and subtle non-verbal aspects that may cause problems in social communication were all noted. These issues have caused significant impairment in social, occupational, and now legal aspects of Mr. Mallatt's life. <u>An all-encompassing pursuit of an interest involving a topic to which one devotes an inordinate amount of time in ritual, routine, or amassing information that is abnormal in intensity is further symptomatic of his disorder.</u> Assessment findings indicate the downloads and large quantities of files saved for later were part of his routine of amassing information, which over time elevated his sex drive and sexual compulsivity.

*Id.* at 8 (emphasis added). With respect to the defendant's potential to recidivate, Dr. Giles explained:

> Areas of risk include a lack of positive significant social influences, limited capacity for relationship stability, general social rejection, lack of concern for others, sexual preoccupation, sex as coping, and deviant sexual preference. Narcissistic and Schizoid personality traits were indicated in psychological testing and clinical interview findings, but an Axis II diagnosis was deferred at this time. Mr. Mallatt's Asperger's Disorder and personality traits present some challenges with regards to addressing his social deficits and relational skills related to the risk factors noted above, but these issues alone have not been found in the professional literature to significantly increase the risk of sexual recidivism. In Mr. Mallatt's favor he is a very cerebral individual and is likely to benefit from therapeutic intervention and education on the topic and how to address his risk factors. Assessment findings indicate he generally has good judgment and impulse control.

*Id.* at 7. Importantly, noting that the defendant has no known contact offense history, Dr. Giles also stated that "[i]n general, the research literature on sexual recidivism data

suggest that child pornography users with no known contact offense history are at relatively low risk of contact offending." *Id.*  He noted that "[i]f Mr. Mallatt were to sexually reoffend it is likely through the Internet or similar medium in which he could have convenient and anonymous access to deviant content," concluding that "based on the constellation of issues, it is my professional opinion that Mr. Mallatt's risk to sexually reoffend with a non-contact sexual offense is in the moderate to moderate-low risk range." *Id.*  Further, he found that "[t]he likelihood that [Mallatt's] deviant behavior could escalate to a contact offense is considered in the low range." *Id.*

Based on his findings, Dr. Giles recommended that the defendant "complete a course of sex offense specific therapy that includes both individual and group milieus with clinicians trained in the assessment and treatment of adult sex offenders," and "seek out a psychiatric consultation to determine if a course of psychotropic medications would be advantageous in the management of his sex drive." *Id.*  Noting that Mallatt "recognizes he lacked control over his behavior, and has started treatment to increase his understanding into what contributed to his behavior and manage ongoing risks," Dr. Giles stated that, in his opinion, "[Mallatt's] treatment could be done in a community based setting with adequate supervisory supports (i.e. probation, therapy, peer support, polygraphs, etc.)." *Id.*

The record also shows that Mallatt has received counseling and mental health treatment from Counseling Affiliates of Nebraska in Lincoln, Nebraska, and treatment notes from Dr. Mary Paine, Ph.D., indicated that Mallatt has "marked mental health issues," and "meets the diagnostic criteria for Asperger's Disorder, which explains his marked social deficits, difficulty reading and responding to emotional cues, general

oddness, and intimacy deficits."   Filing No. 38, PSR at 12.   The PSR reports that Dr. Paine stated that "her clinical impression of the defendant is that he suffers from Asperger's Syndrome and Generalized Anxiety Disorder, which she described as being crippling."   *Id.*   Dr. Paine expressed concern that Mallatt is "ill-equipped for the prison system because he is unable to read social cues" and has "a profound difficulty showing emotion and responding to emotions of others."   *Id.*   Dr. Paine also "indicated she believes the defendant will be vulnerable in a prison setting despite his physical size and it is likely he will not receive treatment for his Asperger's Syndrome, which is of great concern in light of the severity of his social and emotional problems."   *Id.*

Dr. Paine testified at the sentencing hearing on November 8, 2013.   She is a clinical psychologist with a Ph.D. from the University of Nebraska at Lincoln.   She has been working with sex offenders since 1989.   She has conducted risk assessments for presentencing, juvenile court evaluations, and risk evaluations for the federal pretrial and probation departments.   She has also done extensive inpatient sex offender treatment at the Lincoln Regional Center for several years.   She has been supervising an outpatient sex offender treatment program at the Community Health Center of Lancaster County for 14 or 15 years.   She testified that she has conducted hundreds of risk assessments.

Dr. Paine testified the defendant was referred to her by Federal Pretrial Services as a condition of his community placement.   She has been treating him on a weekly basis since February 2013.   Although she was not asked to provide a formal risk assessment for the defendant, she testified that she assesses and monitors risk as she goes along in treatment.   She stated that from the outset, she knew immediately that

there was something "definitely not right" with Mr. Mallet.  As his therapy progressed, she realized that he had some very profound social and emotional issues, inasmuch as it was evident that he did not do a very good job of reading emotions or responding to emotions and it was oftentimes difficult to read him.  She stated it quickly became clear to her that the defendant had Asperger disorder that had gone diagnosed for his entire life, but had been profoundly disabling.  She also stated that there is a neurological basis for the condition.  Dr. Paine testified that Mallatt's ability to read and appropriately respond to emotional or social situations is very limited and he has severely impaired problem-solving abilities.  She stated that he would have difficulty adapting to a prison setting.

She also stated that she has worked with many people charged with child pornography and she found the defendant unusual in a number of ways.  Specifically, she found the degree and severity of his impairment was noteworthy.  She stated the defendant has never had any emotionally intimate or sexual relationship.  She noted that the fact that he is working in a restaurant kitchen in spite of having two master's degrees and a bachelor's degree is directly related to his Asperger syndrome and his anxiety disorder.

She assessed Mallatt's future risk to reoffend as low to moderate.  She believes that Mallatt has taken his legal situation extremely seriously and understands the severity of the penalties for his crime.  She also stated that through treatment he has come to have an appreciation that the images he was viewing were real children in real situations.  She clarified that the "moderate" risk she assessed would be related to viewing pornography in the future, or going on the Internet to view pornography again,

but that it is very highly unlikely that Mallatt would to be a threat to or would approach children.

She also testified that she believed the defendant he would be compliant with conditions attached to placement in the community.  She found nothing to suggest that the defendant is a predator.  She testified she found him to be amenable and open to treatment.  She stated that incarceration would not be an appropriate disposition; rather, he should be placed in a sexual offender treatment program.  She explained that Mallatt is not just a sex offender—he has very significant emotional and social disabilities that have already affected the course of his life.  She stated she had safety concerns with respect to his adjustment within a prison setting.  She was concerned that, inadvertently or for reasons not under his control, he would place himself in danger and would end up in protective custody or administrative segregation where he would receive no treatment at all.

She also testified that she is familiar with the types of treatment provided in correctional facilities and knows that Mallatt would not receive any highly individualized treatment in prison.  She stated he needs serious one-on-one individualized therapy and that sort of treatment would be available to him on an outpatient basis in Lincoln, Nebraska.

Dr. Paine also stated that Asperger syndrome is a subcategory of autism, on the same spectrum of disorders.  She noted that, although Asperger syndrome tends to be a lifetime condition, there are treatments that can help individuals function better.  She stated she was treating the defendant for paraphilia NOS, noting that not all individuals who view child pornography are given a diagnosis of pedophilia.  Although Mallatt

acknowledged that he viewed images of prepubescent children, he denied attraction to prepubescent children.

In response to questioning by the court, Dr. Paine clarified that the defendant's ability to read social cues is so limited that he would not be able to interact with the prison population. She stated that Mallatt would stand out in some unique ways and would be a likely candidate for isolation confinement as a result of his inappropriate conduct. She stated that she agreed with Dr. Giles's diagnosis of Asperger syndrome and noted that, with respect to Mallatt, it is not a subtle diagnosis.

She testified that while working on her Master's degree, she worked at the Nebraska Penal and Correctional Complex in both the Diagnostic and Evaluation Department and the Mental Health Unit where sex offender treatment services were provided. She also stated that she worked at the Lincoln Regional Center for 7 years. She has consulted with the Community Mental Health Center of Lincoln and was instrumental in developing sex offender treatment services. She supervises sex offender treatment staff and provides treatment. Additionally, she makes decisions as to who to admit to the treatment program—including post-incarceration civil commitments and individuals referred as a step down from the regional centers—based on appropriateness for treatment.

She also testified that she was confident that if Mallatt participates in an outpatient treatment program, it would be adequate to keep him out of trouble. She was very comfortable in stating that he was an appropriate candidate for outpatient sex offender treatment from a clinical standpoint. She stated his clinical needs cannot only be met by outpatient sex offender treatment, but they will be better met because of the

frequency he will be able to have individual therapy along with group therapy. She stated he would be able to pay for treatment since he is working, but that if he were not able to afford it, he would be eligible for treatment at the Community Mental Health Center for a sliding-scale fee based on his ability to pay.

She further testified she was confident that he would fare well living independently on his own. She stated that he appreciates the seriousness of his conduct enough that he would not get in trouble again. His behavior has told her that he is serious about treatment, he wants help, and he understands that he has a problem. She also stated that she was comfortable putting her reputation on the line in finding that he is at low to moderate risk to reoffend.

At the conclusion of the hearing, the government argued for a guideline sentence, stating that the guideline range that Congress felt was appropriate in this case is ten years because that is the statutory maximum. The defendant moved for a variance from the guidelines, arguing for a shorter term of incarceration or no incarceration, based on the defendant's history, his amenability to treatment, his psychological makeup, and his employment.

### B.  LAW

#### 1.  Sentencing

Because the Sentencing Guidelines are no longer mandatory, the range of choice in sentencing dictated by the facts of the case has been significantly broadened. *See United States v. Booker*, 543 U.S. 220, 260-61 (2005); *Gall v. United States*, 552 U.S. 38, 59 (2007); *Kimbrough v. United States*, 552 U.S. 85, 101 (2007); *Rita v. United States*, 551 U.S. 338, 349-50 (2007); *Cunningham v. California*, 549 U.S. 270, 286-87

(2007).  District courts must "give respectful consideration to the Guidelines," but are permitted "'to tailor the sentence in light of other statutory concerns as well.'" *Kimbrough*, 552 U.S. at 101 (quoting *Booker*, 543 U.S. at 245-246).

In imposing a sentence, the district court must consider the factors set out in the Sentencing Reform Act at 18 U.S.C. § 3553(a), including the nature of the offense, history and characteristics of the defendant, the need to deter criminal conduct, and the need to protect the public from further crimes by the defendant.  *See, e.g., Gall*, 552 U.S. at 41, 49-50 & n.6; *Booker*, 543 U.S. at 259-60; *Nelson v. United States*, 555 U.S. 350, 351-52 (2009) (per curiam).  That statute "contains an overarching provision instructing district courts to 'impose a sentence sufficient, but not greater than necessary' to accomplish the goals of sentencing."   *Kimbrough*, 552 U.S. at 101 (quoting 18 U.S.C. § 3553(a)).

The sentencing court must first calculate the Guidelines range, and then consider what sentence is appropriate for the individual defendant in light of the statutory sentencing factors explaining any variance from the former with reference to the latter. *Nelson*, 55 U.S. at 351; *United States v. VandeBrake*, 679 F.3d 1030, 1040 n.7 (8th Cir. 2012) (explaining that the three steps in the post-*Booker* sentencing process are: (1) to determine the initial advisory guideline sentencing range, (2) to determine any appropriate departures (upward or downward) from the guidelines, and (3) to decide whether to vary from the advisory guideline range based on the factors set forth in § 3553(a), so long as such a variance is reasonable).  A sentencing court may not presume that a sentence within the applicable Guidelines range is reasonable.  *Id.*

In determining a sentence, the court can consider whether the guideline at issue exemplifies the Sentencing Commission's "exercise of its characteristic institutional role" which is "to formulate and constantly refine national sentencing standards, basing its determinations on empirical data and national experience, guided by a professional staff with appropriate expertise." *Kimbrough*, 552 U.S. at 108-09; *Rita*, 551 U.S. at 349-50. In formulating most Guidelines, the Commission developed and used data on past practices and recidivism to establish offense levels for each crime, linked to a recommended imprisonment range, based on these sentencing statistics. *Gall*, 552 U.S. at 46 (noting that the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions"); *see* United States Sentencing Comm'n, *Fifteen Years of Guidelines Sentencing:   An Assessment of How Well the Federal Criminal Justice System is Achieving the Goals of Sentencing Reform* 14, 72-73 (November 2004), http://www.ussc.gov/Research_and_Statistics/Research_Projects/Miscellaneous/15_Year_Study/index.cfm ("Fifteen-Year Assessment") (visited Nov. 25, 2013).   When guidelines are not the result of the Commission's exercise of its characteristic institutional role, such as when they are not based on any identified empirical approach, but are instead keyed to or guided by statutory directives, a court is not presented with the "ordinary case," in which "the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives'" and it is "not an abuse of discretion for a district court to conclude when sentencing a particular defendant" that application of the guideline "yields a sentence 'greater than necessary' to achieve §-3553(a)'s purposes even in a mine-run case."

*Kimbrough*, 552 U.S. at 109-110 (quoting *Rita*, 551 U.S. at 350); *see also Gall*, 552 U.S. at 46 n.2 (noting that not all Guidelines are tied to empirical evidence).

Both for policy reasons and because Congress had enacted mandatory minimum sentences, the Commission departed from past practices in setting offense levels for child abuse crimes and sexual offenses. Fifteen-Year Assessment at 15, 72-73; United States Sentencing Comm'n, *The History of the Child Pornography Guidelines* 44-48 (October 2009), http://www.ussc.gov/Publications/Offense_Types/index.cfm/20091030_History_Child_Pornography_Guidelines.pdf (visited Nov. 25, 2013) ("2009 Child Porn. History Rep't") (discussing the Commission's approach to setting a base offense level that corresponds to a mandatory minimum sentence); Troy Stabenow, *Deconstructing the Myth of Careful Study: A Primer on the Flawed Progression of the Child Pornography Guidelines* (July 3, 2008), http://www.fd.org/navigation/select-topics-in-criminal-defense/sentencing-resources/subsections/deconstructing-the-guidelines (unpublished comment) (visited Nov. 25, 2013). The Guidelines for child exploitation offenses were not developed under the statistical approach, but were promulgated, for the most part, in response to statutory directives.[3]  *See* 2009 Child Porn. History Rep't

---

[3] Over the years, Congress has passed numerous laws of increasing severity that regulate child pornography and exploitation of children.  *See, e.g.,* the Protection of Children Against Sexual Exploitation Act of 1977, *codified as amended* at 18 U.S.C. §§ 2251-2253; the Child Protection Act of 1984, *codified as amended* at 18 U.S.C. § 2253; the Child Protection and Obscenity Enforcement Act of 1988, *codified as amended* at 18 U.S.C. §§ 2251 & 2252(a); the Sex Crimes Against Children Act of 1995, *codified as amended* at 18 U.S.C. §§ 2251 & 2252; the Child Pornography Prevention Act of 1996, *codified as amended* at 18 U.S.C. § 2251 (extending the prohibition against child pornography to sexually explicit images that appear to depict minors but were produced without using any real children), *invalidated as unconstitutional* in *Ashcroft v. Free Speech Coal.*, 535 U.S. 234 (2002)), *& 2252A; the Protection of Children from Sexual Predators Act of 1998, codified as amended* at 18 U.S.C. § 2426; the Prosecutorial Remedies and Other Tools to End the Exploitation of Children Today Act of 2003 ("PROTECT Act"), *codified as amended* at 18 U.S.C. § 2252B; the Effective Child Pornography Prosecution Act of 2007, Pub. L. 110-358; and the PROTECT Our Children Act, Pub. L. No. 110–401, § 304 (2008).  In late 2012, Congress enacted the Child Protection Act of 2012, which raised the statutory maximum term of imprisonment for possession of child pornography from ten to 20 years for defendants

at 8–50 (discussing the various statutes related to child pornography that Congress has enacted since 1977); *see also* United States Sentencing Comm'n*, Report to Congress: Sex Offenses Against Children, Findings and Recommendations Regarding Federal Penalties* (June 1996), http://www.ussc.gov/Legislative_and_Public_Affairs/ Congressional_Testimony_and_Reports/Sex_Offense_Topics/199606_RtC_Sex_Crime s_Against_Children/SCAC_Executive_Summary.htm/199606_RtC_SCAC.pdf (visited Nov. 25, 2013) ("1996 Rep't to Cong."); United States Sentencing Comm'n, *Federal Child Pornography Offenses* (Dec. 2012), http://www.ussc.gov/Legislative_ and_Public_Affairs/Congressional_Testimony_and_Reports/Sex_Offense_Topics/2012 12_Federal_Child_Pornography_Offenses/index.cfm/Full_Report to Congress.pdf ("2012 Rep't to Cong."); U.S.S.G. App. C, Vol. I, Amends. 435 & 436 (Nov. 27 1991), 537 & 538 (Nov. 1, 1996); Vol. II, amends. 592 (Nov. 1, 2000), 615 (Nov. 1, 2001), 649 (April 30, 2003), 651 (Oct. 27, 2003); Vol. II, amends. 664 (Nov. 1, 2004), 733 7 736 (Nov. 1 2009).

The text and structure of the criminal child pornography statutes prohibit conduct across a spectrum of activity ranging from merely possessing child pornography to "mailing, transporting or shipping child pornography" to "knowingly receiving or distributing child pornography" to "knowingly reproducing, advertising, promoting, presenting or distributing" child pornography to "knowingly selling or possessing with intent to sell" child pornography. 18 U.S.C. § 2252A(a)(1)-(4). The clear focus of this legislation and concomitant Guidelines revision is on the patent evils of child

---

who possessed images of a prepubescent minor or a minor under 12 years of age. *See* P. L. No. 112–206, 126 Stat. 1490 (Dec. 7, 2012), *codified at* 18 U.S.C. § 2252(b)(2) and 18 U.S.C. § 2252A(b)(2) (2013).

pornography and the new dimension that computer technology adds to those evils.  *See* Child Pornography Prevention Act of 1996, Omnibus Consolidated Appropriations Act, Pub. L. No. 104-208, § 121, 1996 H.R. 3610, 104th Cong., 110 Stat. 3009, 3009-26 (1996); *see also* notes following 18 U.S.C.A. § 2251; 2009 Child Porn. History Rep't at 30-31.  In particular, amendments to the Guidelines reflect Congressional concerns that "pedophiles, including those who use the Internet, are using child pornographic and obscene material to desensitize children to sexual activity, to convince children that sexual activity involving children is normal, and to entice children to engage in sexual activity."  U.S.S.G. App. C., Vol. 2, amend. 592 (Nov. 1, 2000); 2009 Child Porn. History Rep't at 30-31.  In drafting the Guidelines, the Commission was also interested in "how best to identify those offenders at the greatest risk of recidivism."  2009 Child Porn. History Rep't at 37.  The primary victims of the crime of possession of pornography are the exploited children.  *See United States v. Rugh*, 968 F.2d 750, 756 (8th Cir. 1992).

The Commission noted in 2009 that "[s]entencing courts have also expressed comment on the perceived severity of the child pornography guidelines through increased below-guidelines variance and downward departure rates."  2009 Child Porn. History Rep't at 54.  Notably, in recent years the average guideline minimum for nonproduction child pornography offenses has increased:  in fiscal year 2004—the last full fiscal year when the guidelines were mandatory and the first full fiscal year after the enactment of the PROTECT Act—the average Guideline minimum was 50.1 months of imprisonment, and the average sentence imposed was 53.7 months; by fiscal year 2010, as more cases were affected by the PROTECT Act's increased penalties, the

average guideline minimum was 117.5 months of imprisonment, and the average sentence imposed was 95.0 months.  2012 Rep't to Cong. at 315-16.

In its most recent report, the Sentencing Commission publicly declared the existing Guidelines for child pornography offenses are flawed and in need of repair.  *Id.* at 320-26.  The Commission addressed the sentencing disparities between courts following the advisory Guidelines ranges in § 2G2.1 and those varying from the Guidelines.  *See id.* at 314.  The Commission noted that "as a result of recent changes in the computer and Internet technologies that typical non-production offenders use, the existing sentencing scheme in non-production cases no longer adequately distinguishes among offenders based on their degrees of culpability."  *Id.,* Executive Summary at ii. The Commission explains:

> [F]our of the of six sentencing enhancements in § 2G2.2—those relating to computer usage and the type and volume of images possessed by offenders, which together account for 13 offense levels—now apply to most offenders and, thus, fail to differentiate among offenders in terms of their culpability.  These enhancements originally were promulgated in an earlier technological era, when such factors better served to distinguish among offenders.  Indeed, most of the enhancements in § 2G2.2, in their current or antecedent versions, were promulgated when the typical offender obtained child pornography in printed form in the mail.

*Id.,* Exec. Summary at iii.  The Commission also states that "[a] variety of stakeholders in the federal criminal justice system, including the Department of Justice, the defense bar, and many in the federal judiciary, are critical of the current non-production penalty scheme."  *Id.* at xii.

The Commission, in agreement with the general consensus among stakeholders, believes that child pornography offenses are extremely serious, but it "also concurs with the many stakeholders who contend that the sentencing scheme should be revised to

better reflect both technological changes in offense conduct and emerging social science research and also better account for the variations in offenders' culpability and their sexual dangerousness."  *Id.,* Exec. Summary at xix.

Further, the Commission also notes that stakeholders have voiced the criticism that "[t]here is no rational basis to treat receipt offenses (which carry a mandatory minimum five-year term of imprisonment) and possession offenses (which do not carry a mandatory minimum term of imprisonment) differently under the guidelines or penal statutes.  Virtually all offenders who possess child pornography previously knowingly received it."  *Id.,* Rep't at 13; s*ee, e.g., United States v. Richardson,* 238 F.3d 837, 839-40 (7th Cir. 2001) (Posner, J.) (finding the distinction between receipt and possession offenses to be "tenuous" and "puzzl[ing]" because receipt is a logical predicate to possession—"possessors, unless they fabricate their own [child] pornography, are also receivers [at some earlier point in time]").  Importantly, the Commission "believes that Congress should amend the statutory scheme to align the penalties for receipt and possession offenses[,]" noting that its "review of over 2,000 non-production cases has demonstrated that the underlying offense conduct in the typical case in which an offender was prosecuted for possession was indistinguishable from the offense conduct in the typical case in which an offender was prosecuted for receipt."[4]  2012 Rep't to Cong., Executive Summary at xix, xx.

---

[4] The Commission found "significant unwarranted sentencing disparities among similarly situated offenders based in large part on whether they were charged with possession or receipt."  *Id.* at xx, Rep't at 214–15.  The Commission unanimously recommends that Congress align the statutory penalties for receipt and possession.  *Id.,* Rep't at 329.  Further, "the Commission unanimously believes that, if Congress chooses to align the penalties for possession with the penalties for receipt and maintain a statutory mandatory minimum penalty, that statutory minimum should be less than five years."  *Id.*

The Commission concluded that "the current sentencing scheme results in overly severe guideline ranges for some offenders based on outdated and disproportionate enhancements related to their collecting behavior." *Id.* at 321. At the same time, the Guidelines scheme results in unduly lenient ranges for other offenders who are more culpable or dangerous. *Id.* For instance, the Commission found that, for 2010, the enhancements for possessing materials depicting prepubescent minors (§ 2G2.2(b)(2)), use of a computer (§ 2G2.2(b)(6)), and number of images (§ 2G2.2(b)(7)) applied in over 95% of all § 2G2.2 cases. *Id.* at 209. Approximately 70% of offenders who received a number-of-images enhancement received the maximum 5-level enhancement based on possession of 600 images or more. *Id.* at 141. The enhancement for possession of material portraying violence or sadomasochistic conduct applied in 74% of all § 2G2.2 cases. *Id.* at 209.

The Commission acknowledges that over the last decade, technological changes, such as the widespread use of P2P file-sharing networks, have changed the typical offender's profile. *Id.* at 312–13. In particular, the anonymous and ready accessibility offered by new technologies means that the typical offender's collection has not only grown in volume but is also likely to include more of the worst kinds of material, including graphic sexual abuse of prepubescent children. *Id.* at 316. Now, due to "dramatic technological changes that have greatly facilitated the commission of child pornography offenses," even "entry-level offenders" can easily acquire and distribute large quantities of child pornography. *Id.* at 6, 149, 154, 312-13. The Commission recommends that the nonproduction Guideline should be revised to more fully account for three factors:

1)  the content of an offender's child pornography collection and the nature of an offender's collecting behavior (in terms of volume, the types of sexual conduct depicted in the images, the ages of the victims depicted, and the extent to which an offender has organized, maintained, and protected his collection over time, including through the use of sophisticated technology);

2)  the degree of an offender's engagement with other offenders—in particular, in an Internet "community" devoted to child pornography and child sexual exploitation; and

3)  whether an offender has a history of engaging in sexually abusive, exploitative, or predatory conduct in addition to his child pornography offense.

2012 Rep't to Cong. at 320.

The Department of Justice ("DOJ") has expressed agreement with "the Report's conclusion that the existing Specific Offense Characteristics ("SOCs") in USSG § 202.2 may not accurately reflect the seriousness of an offender's conduct, nor fairly account for differing degrees of offender dangerousness."  *See* Letter from Anne Gannon, Nat'l Coordinator for Child Exploitation Prevention and Interdiction, Office of the Deputy Attorney General, United States Dep't of Justice, to Honorable Patti B. Saris, Chair, United States Sentencing Comm'n (Mar. 5, 2013), available at http://sentencing.typepad.com/files/doj-letter-to-ussc-on-cpreport.pdf (visited Nov. 26, 2013).  The DOJ recommends targeted revisions to the Guidelines that focus on an offender's communication/group membership and sophistication (i.e., use of technology to evade detection) and on the duration of the conduct, the pattern of sexual abuse or exploitation activity, and image severity.  *Id.* at 3.  It recommends eliminating altogether the enhancement for use of a computer and also recommends that the numeric thresholds for quantity enhancements be substantially increased.  *Id.* at 4.

The fairness of the Guidelines is heavily dependent on fair and reasonably consistent charging policies in the DOJ. Fifteen-Year Assessment at 23-24. The Commission has acknowledged that often "the value of a mandatory minimum sentence lies not in its imposition, but in its value as a bargaining chip to be given away in return for the resource-saving plea from the defendant to a more leniently sanctioned charge." United States Sentencing Comm'n, *Special Report to Congress: Mandatory Minimum Penalties in the Federal Criminal Justice System* 14-15 (August 1991) ("1991 Mand. Min. Rep't"), http://www.ussc.gov/Legislative_and_Public_Affairs/Congressional_Testimony_and_Reports/Mandatory_Minimum_Penalties/199108_RtC_Mandatory_Minimum.htm (visited Nov. 26, 2013). Recently, the Commission found its "preliminary review of the available sentencing data suggests that the mandatory minimum penalties for certain non-contact child pornography offenses may be excessively severe and as a result are being applied inconsistently." United States Sentencing Comm'n, *Report to the Congress: Mandatory Minimum Penalties in the Federal Criminal Justice System*, Executive Summary at xxxi (Oct. 2011) ("2011 Mand. Min. Rep't"), http://www.ussc.gov/Legislative_and_Public_Affairs/Congressional_Testimony_and_Reports/Mandatory_Minimum_Penalties/20111031_RtC_Mandatory_Minimum.cfm (visited Nov. 26, 2013). The Commission acknowledges that widespread sentencing disparities among similarly situated offenders in child pornography cases are attributable in part to disparate charging practices. 2012 Rep't to Cong. at 13.

Long terms of imprisonment for non-acting-out offenders have been strongly attacked as unsound and as fundamentally deviating from the Guidelines' overarching policy and expertise. *See, e.g., United States v. Dorvee*, 616 F.3d 174, 185-88 (2d Cir.

2010) (recognizing the district courts' post-*Booker* authority to vary from the Guidelines solely on policy disagreement, and encouraging courts to take discretion seriously in fashioning sentences for child pornography defendants, and stating that U.S.S.G. § 2G2.2 is "an eccentric Guideline of highly unusual provenance which, unless carefully applied, can easily generate unreasonable results"); *United States v. Henderson*, 649 F.3d 955, 960 (9th Cir. 2011) (holding that "district judges must enjoy the same liberty to depart from [the child pornography guideline] based on reasonable policy disagreement as they do from the crack-cocaine Guidelines discussed in *Kimbrough*); *United States v. Grober*, 624 F.3d 592, 609 (3d Cir. 2010) (finding district court had provided "a sufficiently compelling explanation for its policy concerns about § 2G2.2 and its justification for imposing a sentence outside the range § 2G2.2 recommended."); *United States v. Stone*, 575 F.3d 83, 97 (1st Cir. 2009) (expressing view that child pornography guidelines are harsher than necessary).[5]

Sentences imposing no or very little incarceration have been found appropriate for offenders convicted only of possessing child pornography. *See, e.g., United States v. Autery,* 555 F.3d 864 (9th Cir. 2009) (affirming non-Guidelines sentence of five years

---

[5] Numerous district courts have also determined that the Guidelines in child pornography cases are owed less deference than those for other offenses because the Guidelines for child pornography crimes are "largely the product of congressional directives, some of which the Sentencing Commission actively opposed, rather than Commission study and expertise." *United States v. Diaz,* 720 F. Supp. 2d 1039, 1042 (E.D. Wis. 2010); *see, e.g.*, *United States v. Kelly,* 868 F. Supp. 2d 1202, 1208-09 (D.N.M. 2012); *United States v. Munoz,* No. 11-cr-167, 2012 WL 5351750, *4 (D. Minn. Oct. 30, 2012); *United States v. Cameron,* No. 1:09-cr-00024, 2011 WL 890502, *5–6 (D. Me. Mar. 11, 2011), *aff'd in part* 699 F.3d 621 (1st Cir. 2012), *cert. denied* 133 S. Ct. 1845 (2013); *United States v. Riley,* 655 F. Supp. 2d 1298, 1304–05 (S.D. Fla. 2009); *United States v. McElheney,* 630 F. Supp. 2d 886, 891 (E.D. Tenn. 2009); *United States v. Beierman,* 599 F. Supp. 2d 1087, 1100 (N.D. Iowa 2009); *United States v. Phinney,* 599 F. Supp. 2d 1037, 1040 (E.D. Wis. 2009); *United States v. Doktor,* No. 6:08-cr-46, 2008 WL 5334121, *1 (M.D. Fla. Dec. 19, 2008); *United States v. Stern,* 590 F. Supp. 2d 945, 960-61 (N.D. Ohio 2008); *United States v. Johnson,* 588 F. Supp. 2d 997, 1003 (S.D. Iowa 2008); *United States v. Noxon,* No. 07-40152-01, 2008 WL 4758583, *2-3 (D. Kan. Oct. 28, 2008); *United States v. Ontiveros,* No. 07-CR-333, 2008 WL 2937539, at *8 (E.D. Wis. July 24, 2008); *United States v. Hanson,* 561 F. Supp. 2d 1004, 1008-11 (E.D. Wis. 2008); *United States v. Shipley,* 560 F. Supp. 2d 739, 744 (S.D. Iowa 2008); *United States v. Goldberg,* No. 05-CR-0922, 2008 WL 4542957, at *6 (N.D. Ill. Apr. 30, 2008).

of probation and no period of incarceration for possession of child pornography); *United States v. Stall,* 581 F.3d 276 (6th Cir. 2009) (affirming non-Guidelines sentence of one day of incarceration followed by ten-year period of supervised release); *United States v. Prisel,* 316 Fed. App'x 377 (6th Cir. 2008) (affirming non-Guidelines sentence of one day in prison followed by eighteen months of home confinement for possession of child pornography); *United States v. Rowan,* 530 F.3d 379 (5th Cir. 2008) (affirming non-Guidelines sentence of five years of probation and no period of incarceration for possession of child pornography); *United States v. Polito*, 215 Fed. App'x 354 (5th Cir. 2007) (per curiam) (affirming non-Guidelines sentence of five years of probation with one year of house arrest for possession of child pornography).[6]  *See also United States v. Morace,* 594 F.3d 340, 351 n. 10 (4th Cir. 2010) (noting "that some district courts have begun sentencing defendants convicted of possessing child pornography to one day of incarceration followed by a term of supervised release");[7] 2012 Report to Cong. at 7 ("[D]efendants sentenced under the non-production child pornography guidelines have received sentences outside of the applicable guidelines more frequently than

---

[6] *But cf. United States v. Camiscione,* 591 F.3d 823, 834-35 (6th Cir. 2010) (reversing sentence of a partial day of incarceration followed by three years of supervised release because the district court did not adequately consider or justify how its sentence promoted general deterrence or avoided unwarranted sentence disparities); *United States v. Pugh,* 515 F.3d 1179, 1192 (11th Cir. 2008) (finding a sentence of five years of probation—as opposed to supervised release with strict conditions—for possession of child pornography substantively unreasonably low).

[7] Numerous district courts have also imposed little or no incarceration.  *See, e.g., United States v. D.M.,* No. 12-CR-170, 2013 WL 1846543 (E.D.N.Y. May 3, 2013), imposing non-Guidelines sentence of five years of strictly supervised probation); *United States v. Evren*, No. 10–CR–131 (E.D.N.Y. Feb. 26, 2013) (imposing non-Guidelines sentence of three years of probation for defendant who pleaded guilty to one count of possession of child pornography); *United States v. Diaz,* 720 F. Supp. 2d at 1048 (imposing non-Guidelines sentence of six months of incarceration followed by twelve years' supervised release); *United States v. Meillier,* 650 F. Supp. 2d 887 (D. Minn. 2009) (imposing non-Guidelines sentence of one day of confinement followed by thirty years of supervised release); *United States v. Boyden*, No. 06–CR–20243, 2007 WL 1725402 (E.D. Mich. June 14, 2007) (imposing non-Guidelines sentence of one day of confinement followed by three years of supervised release, the first year of which to be served in a community correctional facility).

defendants in all other major types of federal criminal cases."); *id.* at 130 (all child pornography defendants sentenced to probation in fiscal year 2010 were convicted of possession only).

### II.  DISCUSSION

#### A.  Guideline Calculation

The court has adopted the findings in the PSR.  Filing No. 34, text minute entry. Mallatt's base offense level under the Guidelines is 18.   *See* U.S.S.G. § 2G2.2(a)(1). The court finds the following adjustments are applicable:  a two-level increase under U.S.S.G. § 2G2.2(b)(2) for possession of material containing a prepubescent minor; a five-level increase under U.S.S.G. § 2G2.2(b)(3)(B) for an offense involving distribution for the receipt, or expectation of receipt, of a thing of value, but not for pecuniary gain; a four-level increase under U.S.S.G. § 2G2.2(b)(4) for material that portrays sadistic or masochistic conduct or other images of violence; a two-level increase under U.S.S.G. § 2G2.2(b)(6) for use of a computer; and a five-level increase under U.S.S.G. § 2G2.2(b) for possession of more than 600 images.  The court finds a downward adjustment for acceptance of responsibility is warranted.   Mallatt's resulting offense level is 33.   At criminal history category I, Mallatt's recommended sentencing range under the Guidelines is 120 months.  No departure is warranted.

#### B.  Section 3553(a) Factors

Mallatt's motion for a deviation or variance from the Guidelines is granted.  The court finds a sentence outside the Guidelines is warranted in this case.  A sentence of time served, followed by six years of supervision with special conditions including intensive treatment is adequate to fulfill the goals of sentencing in this case.

With respect to the nature and circumstances of the offense, the court finds that child pornography offenses amount to sexual exploitation and are serious offenses. Sexual exploitation offenses include the production of child pornography and the exploitation of children for the purposes of prostitution or the production of pornography, as well as trafficking in pornography.  Criminalizing the possession of child pornography is a necessary complement to laws banning distribution of such items, and is intended to destroy the market for exploitation of children.  Mallatt's conduct falls at the low end of the continuum of criminal conduct—from possession to distribution to production to predatory abuse—that exploits children.  A possessor of child pornography is the least culpable in the chain and is a marginal player in the overall child exploitation scheme.

The varying levels of participation and blameworthiness in connection with distribution are meant to be accounted for in the Guidelines' market-oriented scheme. The statutes criminalizing the possession and distribution of child pornography are aimed at the widespread and profit-driven dissemination of child pornography that the Internet facilitates and fosters.  Although file-sharing arrangements contribute to Internet trafficking in child pornography, there is a qualitative difference between sharing one's computer files and selling child pornography for profit.  There has been no showing that Mallatt possessed child pornography in order to entice a child, had any improper contact with children, photographed minors engaged in sexual conduct, or made attempts to contact a child.

In determining this sentence, the court has considered Mallatt's history and characteristics.  The unrefuted psychological evidence establishes that the defendant is

profoundly disabled by Asperger syndrome,[8] a neurological condition that is on the Autism spectrum.  His condition undoubtedly contributed to his actions and must be considered in determining his culpability.  Typically, people with Asperger syndrome engage in odd, ritualistic or repetitive behaviors and characteristically develop an intense, almost obsessive preoccupation with a certain subject.  Also, other disorders such as obsessive compulsive disorder, depression and anxiety disorders often co-exist with Asperger syndrome.

Importantly, psychological testing shows that the defendant is at low to moderate risk to reoffend and at even lower risk to commit acts of sexual abuse.  The government has produced no evidence that suggests that the psychological evidence presented to the court is inappropriate or unreliable.  Two highly-qualified psychologists evaluated the defendant and he has been treated by a clinical psychologist with extensive experience in sex-offender treatment, both in the community and in a correctional facility environment.  The court credits Dr. Paine's testimony that, as a result of his condition and inability to interact appropriately with others, the defendant would not adjust to prison conditions.  The court further credits her testimony that the defendant has and will benefit from intensive outpatient sex-offender treatment that will be available to him

---

[8] Asperger syndrome (AS) is "an autism spectrum disorder (ASD), one of a distinct group of complex neurodevelopment disorders characterized by social impairment, communication difficulties, and restrictive, repetitive, and stereotyped patterns of behavior."  See National Institutes of Health, National Institute of Neurological Disorders and Stroke (http://www.ninds.nih.gov/disorders/asperger/ detail_asperger.htm#246933080). "Current research points to brain abnormalities" as the cause of Asperger syndrome since "[u]sing advanced brain imaging techniques, scientists have revealed structural and functional differences in specific regions of the brains of children who have Asperger syndrome versus those who do not have the disorder."  Id. (noting that "[t]hese differences may be caused by abnormal migration of embryonic cells during fetal development that affects brain structure and early 'wiring' in childhood and then goes on to affect the neural circuits that control thought and behavior.") Also, "[a] different study investigating brain function in adults with AS revealed abnormal levels of specific proteins that correlate with obsessive and repetitive behaviors."  Id.

in the community, but that he would not be likely to receive in a prison setting. The government produced no evidence to counter these conclusions.

The defendant's unique characteristics, principally his neurological condition, mental health status and diagnosis of Asperger syndrome, are important considerations in the court's decision. All the experts agree, supported by objective tests, that the defendant is "not quite right." He is highly educated, yet is employed as kitchen help in a restaurant, where he has worked since he was sixteen years old. He has no friends, no social or interpersonal skills, and has formed no intimate human relationships in his life. Based on these characteristics and resulting inappropriate behavior in social situations, the defendant would potentially be in danger in a prison setting and would most likely be placed in administrative confinement where he would receive no treatment.

The court has consulted the Guidelines and has used the Guidelines calculation as its initial starting point. However, the child pornography Guidelines are driven by Congressional directive and are not grounded in any scientific, statistical, or empirical method. The advice imparted in the Guidelines does not reflect the sort of empirical data, national experience, and independent expertise that characterize the Sentencing Commission's institutional role. Given the acknowledged flaws in the Guidelines' scheme for punishment of Internet child pornography crimes, the court does not accord a high degree of deference to the Guidelines. It is difficult to defer to the Commission's Guidelines when even the Commission believes they are flawed.

It is clear that the Sentencing Commission diverged significantly from its studied, empirical approach in formulating the Guidelines that apply to Mallatt's case and the

result is a recommended sentence that is greater than necessary to provide just punishment. Although downloading child pornography is hardly a harmless activity, it is not the equivalent of direct physical abuse, sexual molestation of children, or production of child pornography.

The court has also considered the need to avoid sentencing disparities, but is not persuaded by the comparison to the sentences imposed on other child pornography offenders in this district. It is the court's duty under *Booker* and progeny to make an individualized assessment with respect to this defendant. The court agrees with the Sentencing Commission that the problem with the Guidelines for nonproduction offenses is that the Guidelines do not help the court distinguish between run-of-the-mill offenders and the worst offenders. The Sentencing Commission has acknowledged that enhancements that were originally intended to apply to only those offenders who committed aggravated child pornography offenses are now being applied routinely to most offenders. Also, as noted above in connection with the discussion of the defendant's history and characteristics, the defendant is an unusual offender because of his neurological condition.

The Guidelines' sentencing scheme for child pornography crimes illogically skews sentences for "average" defendants to the upper end of the statutory range, regardless of the particular defendant's acceptance of responsibility, criminal history, specific conduct, or degree of culpability, thus blurring distinctions between the least culpable and the worst offenders. In the context of this and other Internet child pornography crimes that involve peer-to-peer networks, the Guidelines provide little distinction between a low-level distributor and a high-level distributor and no distinction

between one who merely possesses and those who "receive," as opposed to "distribute." In this court's experience, there is essentially no Internet child pornography offender who could end up with a Guidelines-recommended sentence that falls at or close to the low end of the statutory range for either a possession or receipt offense. With the base offense level for receipt set at 22, and the base offense level for possession set at 18, and a two-point enhancement for use of a computer that is applied in every Internet child pornography case, only an offender who possessed fewer than ten images that did not contain any of the images of prepubescent minors or sadistic or masochistic acts that are widely prevalent in child pornography could receive a sentence at the low end of the statutory range. Because of the nature of peer-to-peer file-sharing programs, a simple possessory crime evolves into a case that can be charged under the receipt prong of a receipt-and-distribution offense as soon as someone accesses a shared file. In this, as in virtually every child pornography possession prosecution, the application of numerous and severe enhancements results in a Guidelines sentencing range that exceeds the statutory maximum.

Mallatt is a typical offender in that he has an insignificant criminal history. He is subject to enhancements for use of a computer and for the number and type of images that apply in virtually every case. The Internet has become the typical means of obtaining child pornography, and Internet child pornography cases are essentially the only kind of child pornography crime prosecuted in federal court. The enhancements for use of a computer and number of images lack value as a reliable proxy for culpability and are a poor gauge of relative levels of fault between offenders. Because of the unfortunate ease with which large numbers of images can be accessed and stored,

most child pornography offenders are subject to enhancements from two to five levels for the number of images.

In this type of distribution scheme, the number of images does not provide the distinction between a large-scale and a small-scale child pornography purveyor that Congress and the Sentencing Commission must have envisioned when promulgating this market-based and quantity-driven scheme.   For example, in contrast to drug quantity in a drug-trafficking prosecution, where the amount of a drug a defendant possesses may have some correlation to his position in a distribution hierarchy, the number of images a defendant possesses is meaningless as an indicator of any position in a pornography distribution system.   The images can be endlessly replicated. Whatever connection there may be between a defendant's relative guilt and the number of images he possesses, an enhancement of five levels for possession of over 600 images overstates that connection.   Moreover, the enhancement for number of images tops out at a five-level increase for more than 600 images.   In this court's experience, the number of images possessed or distributed usually measure in the thousands.   The number of images enhancement is not rationally connected to the conduct at issue.

The court finds that the ranges of imprisonment recommended under the Guidelines may be appropriate for a sexual predator, but are not a reliable appraisal of a fair sentence in this case.   The statutes criminalizing the possession of child pornography, as amended over time, and as interpreted by the Sentencing Commission in formulating Guidelines, are clearly aimed at the widespread and profit-driven dissemination of child pornography that the Internet facilitates and fosters.   The history of legislative enactments in this area reflects Congressional concern with the use of

31

computers to lure or entice children into sex acts.  Possession of child pornography was criminalized in part because of concerns that the Internet facilitated access to and enticement of minors for sexual exploitation, as well as concerns that pedophiles use the materials to desensitize and entice victims.  This case involves no such conduct. The legislative history also shows Congressional concern with dangerous child abusers and repeat offenders.  The defendant is neither.

Enhancements of increasing severity for quantity and for recidivism are aimed at the most dangerous of child pornography offenders.  The Guideline at issue, § 2G2.2, consists of a hodgepodge of outdated enhancements that apply in nearly every case, rather than furnishing any means to carefully differentiate between offenders based on culpability and dangerousness.  Mallatt does not fall into the category of the most dangerous child pornography offenders.  Based on unrefuted clinical evidence, the defendant has little potential to recidivate, especially with respect to a contact offense. There is no evidence that he has ever abused or is likely to abuse children.  On the culpability spectrum of increasingly serious child exploitation offenses, Mallatt is an example of a defendant who deserves supervision and treatment rather than incarceration, given that he has been convicted of possession rather than receipt and distribution.

As noted, Mallatt was originally charged with a violation of both 18 U.S.C. § 2252A(a)(2), receipt of child pornography, and § 2252(a)(4)(B), possession of child pornography.  There is no principled distinction between receipt and possession, given technological realities.  This case illustrates the dilemma facing defendants charged with both section 2252A and section 2252 offenses.  To obtain pornography via the

Internet, it is generally necessary to receive the pornography in order to possess it. The Sentencing Commission acknowledges that both charges are oftentimes supported by the same conduct. The increased dangers and harms that make distribution a more serious crime than possession are accounted for in the statutory scheme by the mandatory minimum sentence provided in section 2252A, and need not be augmented by Guidelines enhancements that make any distinction between possession and distribution illusory. Punishing mere possession (under the rubric "receipt") at the same level as distribution has the potential to trivialize the distinction.

Under the plea agreement herein, the government agreed to dismiss the more serious charge. In offering a plea agreement that for the count that does not carry a mandatory minimum sentence, the government acknowledges that this defendant is somehow different than most who appear before this court.[9] The government's argument for a Guidelines sentence rests primarily, if not solely, on the number of images (including numerous videos) that the defendant possessed. Expert testimony establishes that the defendant's amassing of a large amount of material was due in part to symptoms that are characteristic of his autistic condition. It is difficult for the court to make any qualitative distinction with respect to culpability based on number of images, especially in these circumstances where the defendant's collecting behavior is affected by a neurological disorder. Both the Sentencing Commission and the DOJ acknowledge that number of images is an outdated indicator of culpability in the technological age.

---

[9] In this court's experience, most offenders are charged with both possession and receipt and distribution, but are offered a plea to the receipt and distribution charge only.

Also, the defendant would be at the low end of the culpability spectrum even if the court were to consider the proposed factors that the Sentencing Commission and the DOJ now advocate.  The defendant's offense did not involve any conduct that the Commission and DOJ agree would be relevant as enhancing factors.  The content of the defendant's child pornography collection is not out of the ordinary—the types of sexual conduct depicted in the images and the ages of the victims depicted are typical of most child pornography offenders sentenced in this court.  The nature of his collecting behavior is unusual only in that it reflects an obsessive preoccupation with child pornography that is characteristic of his brain abnormality.  The seemingly voluminous size of his collection is also attributable to his Asperger syndrome.  There is no evidence that the defendant has organized, maintained, and protected his collection over time through the use of sophisticated technology, he is not a particularly sophisticated offender, and the degree of the defendant's engagement with other offenders through an Internet "community" devoted to child pornography and child sexual exploitation is more attenuated than that of a typical offender, if not totally nonexistent because of his isolation.  Further, the defendant has no history of engaging in sexually abusive, exploitative, or predatory conduct in addition to his child pornography offense.

The court finds that the Guidelines range of ten years' imprisonment is completely out of proportion to the defendant's culpability in this case.  The Guidelines range is based on the imposition of numerous and excessive enhancements for circumstances that appear in nearly every child pornography case (such as use of the Internet, amassing numerous images, possessing images of prepubescent minors, and

depictions of violence) on a first-time offender.  The Guidelines-recommended sentence of ten years—the statutory maximum—is greater than necessary to protect the public and to deter Mallatt from reoffending.  A sentence of time served is appropriate to achieve the goals of sentencing in this case.  This is an offender who has never been incarcerated and who suffers from a serious neurological disorder.

The mere fact of the prosecution of these cases arguably deters others from engaging in this sort of conduct, but much of that market is driven by compulsive behavior that arguably will not be deterred in any event.  The deterrent effect of a prison sentence is further lessened by the international market for child exploitation offenses. The court finds any additional deterrent value of a prison sentence in this case would be marginal.  Expert testimony establishes that the defendant comprehends the severity of his situation and it appears his experience thus far in the prosecution of this offense, together with the treatment he has been and will be provided, are an adequate deterrent to him personally.  Further, to the extent that harsh punishment is necessary to deter harm to children, punishing a less-culpable offender as harshly as the worst does not satisfy the goals of sentencing and encourages disrespect for the law.

The court further finds that an outside-the-Guidelines sentence will respect the distinction between Mallatt's culpability, viewed in the context of his profoundly disabling condition, and the far greater culpability of a distributor or producer of child pornography or an actual predator or abuser.  The sentence imposed on a possessor of child pornography should be proportional to and significantly lower than a sentence for a distribution crime or exploitative crime that involves acts of abuse by a defendant. Under the Guidelines scheme, a person who views child pornography on the Internet

can receive a longer sentence than the actual perpetrators of child abuse and those who commit serious drug crimes, assaults and even murder. This sentence is relatively proportional to the median sentences for defendants who have engaged in more serious child sexual exploitation crimes such as production of child pornography, travel to engage in sexual conduct with a minor, or sexual abuse of minors. Any lack of uniformity between the sentence imposed here and sentences in other cases for the same offense is a product of this court's individualized assessment of the defendant.[10]

This sentence also reflects the court's consideration of the need for the sentence to provide the defendant with needed correctional treatment in the most effective manner under 18 U.S.C. § 3553(a)(2)(D). The testimony of a qualified and respected treating clinical psychologist establishes that the defendant is receptive to treatment, treatment thus far has been effective, and treatment can be more effectively provided in the community than in prison.

In light of all the § 3553(a) factors, because the defendant has been convicted of a nonproduction child pornography offense, has a low potential for recidivism, has no significant prior criminal history, and appears genuinely remorseful about his crime and aware of the harm that it caused, a sentence of time served followed by lengthy and structured supervised release will promote respect for the law and afford an adequate

---

[10] Also, as noted above, to the extent there are disparities, they are the result of the government's charging practices and its exercise of prosecutorial discretion. Such exercise is not the kind of "unwarranted" sentencing disparities that Congress sought to eliminate under § 3553(a)(6). *Pepper v. United States*, 131 S. Ct. 1229, 1249 (2011); *United States v. LaBonte*, 520 U.S. 751, 761–762 (1997) (disparity arising from exercise of prosecutorial discretion not unwarranted—"[i]nsofar as prosecutors, as a practical matter, may be able to determine whether a particular defendant will be subject to the enhanced statutory maximum, any such discretion would be similar to the discretion a prosecutor exercises when he decides what, if any, charges to bring against a criminal suspect. Such discretion is an integral feature of the criminal justice system, and is appropriate, so long as it is not based upon improper factors.").

level of deterrence to similar criminal conduct.  The court's imposition of a six-year period of supervised release will include terms and conditions designed to promote the safety of the public and to afford adequate treatment for the defendant.

### III.  CONCLUSION

The current Guidelines are not a reliable indicator of the Sentencing Commission's view of what a fair sentence should be in nonproduction child pornography cases.  This has been made obvious by the Commission's December 2012 report, criticizing § 2G2.2 and recommending major revisions to the Guidelines. The Department of Justice concurs in those recommendations.  Based upon application of the § 3553(a) factors to the circumstances unique to this case, the court finds that a sentence of time served, followed by 6 years of structured supervised release, is sufficient, but not greater than necessary, to comply with the purposes of sentencing.

IT IS ORDERED:

1.      The defendant's oral motion for a variance is granted.

2.      A Judgment and Commitment and a Statement of Reasons in conformity with this Sentencing Memorandum, and with the court's findings at the sentencing hearing, will issue this date.

DATED this 27th day of November, 2013.

BY THE COURT:

s/ Joseph F. Bataillon
United States District Judge